Good morning, Your Honor. May it please the Court, Stephen H. Aden from Washington, D.C. for the plaintiff for later, Mr. Jonathan Bloedow. Could you pronounce your client's name again? Yes, Your Honor. It's Bloedow. It rhymes with Plato. Thank you. Bloedow. Yes. Thank you very much. I've tried several options this week. It took me a long time. Thank you. Okay. Yes. Thank you. The district court erred first because Mr. Bloedow's allegations were not publicly disclosed before he filed his complaint, and second, because even if they had been, Mr. Bloedow was an original source of the allegations in his complaint. Neither the prior filed California Gonzalez complaint nor the Federal Office of Inspector General report was a public disclosure of Mr. Bloedow's allegations. Gonzalez's allegations that some California affiliates overbilled California's Medicaid program for contraceptives purchased under the 340B program could not have given enforcement authorities in the other 49 states enough information to justify investigating over 100 independent Planned Parenthood corporations. But the Gonzalez complaint couldn't have given them cause to investigate? No, Your Honor. Why not? Under Medicaid, enforcement resides in the states. Each state is required to set up a Medicaid fraud control unit. If you were a discerning attorney general or in the attorney general's office and you read the Gonzalez complaint about practices in California and you alleged it was part of a network of other offices of Planned Parenthood, why wouldn't they give you cause to investigate? Your Honor, what the most recent pronouncement from this court teaches us, which is the case that the defendant cited 28J on, is that you don't look at the allegations from the highest level. You look at them in the granular sense. This is United States ex rel. Metesky v. Raytheon. Raytheon says you look at the allegations at the granular level. So if, for example, a U.S. attorney, say, in New Hampshire or Alaska or someplace, were looking at these allegations, all they would know is that some California affiliates... But in Raytheon, there were just general allegations of fraud and waste in a program. Those are very, very general allegations. That could be just a lot of things. Gonzalez was very specific. He was. He was very specific as to what the scheme was, as to what the problem was, and to what the area was that was under the Medicaid laws. I'm still puzzled by your statement that that would not have given somebody else cause to investigate, and I believe that's your term. Yes, and I'm sorry. I don't mean to be so oblique. There are three reasons. Number one, there are three elements to what the plaintiff in that case alleged. The defendant was different, obviously. The fraud was different, meaning that in Gonzalez, you only had the 340B scheme alleged, whereas in Blado, you have both the 340B and the oral contraceptive scheme. And third, and probably most importantly, the laws relating to the two were totally different. Each of the 50 states under Medicaid establishes its own regime of laws to apply to Medicaid, under the block grant program, naturally. The reimbursement scheme in both California and Washington was pretty similar, correct? I don't know. Well, they're all similar, Your Honor, across. There was a rule here in Washington and there was a rule in California. Right, but again, if you look. What kind of reimbursement you could get. You're asking what kind of reimbursement? Yes. It's a reimbursement based on per patient, and the reimbursement rule is that the provider, the covered provider, allocates the patients, so to speak, the patients to the program, and then every quarter reports on the number of patients, and then there is a rate. They settle out, basically, either the covered provider pays or. But California and Washington had similar limitations on the rate. Roughly similar, but looking, once again, at the highest level under the Metesky case. But if you look at the granular level, they're doing it according to different standards. They're doing it according to. But, counsel, since there's different standards, it seems to me that's closer to an argument that there wouldn't have been collateral stop. There wouldn't have been raised judicata because Washington and California had slightly different Medicaid rules, right? But I think the Gonzales complaint was surely public. Wasn't the OIG report also public? The OIG report was public. It was a public source, but it didn't touch the Gonzales allegations. I mean, it didn't touch the blade allegations because it only referred to Gonzales. California. And then it asked the question, what is going on with the other 49 states? A member of the United States Senate had requested OIG go look at family planning clinics, I think nationwide, right? It did, but it did not mention California's Bladel case, nor did the Gonzales case. The Gonzales case did not allege that there was a widespread industry scheme across the country. It only related to the California allegations. And similar to the OIG report, it did not allege a national scheme of defrauding the different states. I thought the OIG report referred in its introductory part that there had been a QTAM action. Yes. Was there any other QTAM action other than Gonzales? Well, no. That's the one it referred to, Your Honor, obviously. Not by name, but it referred to it by reference. However, it didn't refer to any other, and it didn't refer to Bladel or Washington State. Well, Bladel hadn't been filed. Right. At the time the OIG report came out. Correct. Shortly after that, it was filed. Right. But you just wonder, looking at the OIG report on the Gonzales complaint, why that wouldn't have given somebody cause to investigate in Washington. Well, it wouldn't have given the cause because there were different Planned Parenthoods. There were 103 separate Planned Parenthoods at the time. Your client obviously thought they were pretty close, didn't he? Didn't he post in April 2009? Well, he made that statement. And by making that statement, all he intended to convey was, once again, at the highest level, he was saying this is the same kind of scheme. No, that's not what he said, Counsel. He said this fraud is exactly the same as the fraud being charged in the California by a former chief financial officer of Planned Parenthood of Los Angeles, P. Victor Gonzales. I understand what you're saying, Your Honor. That's pretty specific. He meant that this was overbilling. This is overbilling Medicaid, right? But that's not, according to the Ninth Circuit precedent, what you look at. What you look at is... I just think the Raytheon case is just quite different from this case. It is and it isn't. The reason that the defense contractor cases tend to, in some cases, lead to an industry scheme result is that, in some cases, you have a similarity in the defendant, like in the Boron case. In some cases, you have only a handful, like in the Sandia case in the Tenth Circuit, you have only a handful of defendants under the same contract. That's not what you have here. You have 103 different Planned Parenthoods operating in 50 different states according to 50 different sets of rules under Medicaid. And that's why, when you talk about the authorities, enforcement authorities in one state, like Alaska or New Hampshire, looking at the Gonzalez complaint in California and saying, well, we have to go after our Planned Parenthoods, you're talking about a very serious thing. You're talking about unleashing enforcement authorities to investigate, to question. That's all a very heavy thing, and they are limited in their resources. And consequently, I don't think that it gives them enough just to know that the Gonzalez complaint alleged that a handful of California Planned Parenthood corporations, that would be like on the basis of those nine California Planned Parenthoods immunizing all 103 Planned Parenthoods across the country for this kind of behavior. And obviously, I don't think that's what Congress intended. Counsel, let's suppose that I disagreed with you over the question of public disclosure. Tell me why your client is an original source. Yes, sir. Well, we know that after the recent en banc decision that there are only two factors, there are only two prongs of the original intent rule. Before filing the action, the whistleblower must voluntarily inform the government of the facts which underline allegations of his complaint, which he did. That's not at issue here. And he must have direct and independent knowledge of the allegations underlying his complaint. Now, this statute was amended in 2010, and as I pointed out in my 28J letter, there is a case before this court set for the Ninth Circuit on the, I believe it's the September San Francisco set called Prather, which raises directly the question of, do you apply the pre-2010 or the post-2010 amendments? We believe the better reasoning is to apply this retroactively before 2010. Happy to make an argument on that for you if you'd like. Why don't you tell me about the pre-2010? Yes. We believe that he had direct and independent knowledge of the allegations underlying his complaint because he did quite a bit of his own labor to develop this claim, in fact, much more than any of the other similar cases. Direct and independent knowledge. Right. Like the leaseholders in the Comstock case in the Tenth Circuit, he obtained and reviewed extensive billing records from state Medicaid officials. He conducted interviews of state Medicaid officials to discern what the reimbursement rules required. He interviewed the defendant's head of development in writing to confirm that Planned Parenthood was, in fact, billing at market value rather than acquisition cost, and he utilized the billing records and other information obtained to calculate the total number of claims involved and the amount of fraudulent overbilling. That's what he did. That is a significant amount of his own labor under the precedent. The closest case that the other side has is the case involving Wes Blevin. But in Blevin, they were handed the fraud allegations by an insider, right? The dossier was given to them, and all they did was verify by interviewing a few members of the fraud circle and confirming what had already been handed them in a dossier. So in this case, Mr. Blaydell did much more than that. He did all the things that I mentioned. He worked very hard. In fact, he was working on this theory. He was trying to discern whether there were false claims made before the Gonzalez complaint was actually unsealed, and that only confirmed what he already knew. So that makes him, in our view, an original source. There's no question about that. Counsel, what's the strongest case law support for your position on the public disclosure issue? Say again, Your Honor, I'm sorry? What is the strongest case supporting or the strongest authority supporting your position on the public disclosure issue? Thank you. Your Honor, we think that the 11th Circuit's position in Cooper v. Blue Cross, obviously the person was not an insider. It was simply a person over the age of 65 working and knew what the right rule for application was between the Medicare program and Blue Cross Blue Shield of Florida, and they were considered to be a proper relator. In that case, Cooper, the court said, we consider it to be crucial whether Blue Cross was mentioned by name or otherwise specifically identified in public disclosures. If you go by that rule, the 9th Circuit should also hold that because the Gonzalez complaint did not mention Mr. Blaydell by name, did not mention his fraud, neither did the OIG report, then there was no public disclosure. Okay. You want to stay the rest of your time for rebuttal? Yes, I do. Thank you, Your Honor. Okay. Let's hear from Planned Parenthood. Good morning. Matthew Umhoff on behalf of Planned Parenthood of the Great Northwest, and may it please the court. There are really only two documents the court needs to look at to confirm that the district court got it right here. The first is in Supplemental Excerpt of Record 25. That's the blog post written by Mr. Blaydell back in 2009 where he said that the Gonzalez case was exactly the same as what was going on here in Washington, exactly the same. So when the question on the public disclosure issue is whether the prior public disclosure was substantially similar, Mr. Blaydell's conceded exactly the same, far above just substantially similar. So the second document is Supplemental Excerpt of Record 158. Now, that is a document in which it relates to the original source question. Mr. Blaydell described in his Rule 26 disclosures before the district court exactly what he did and exactly how he learned, because that's the question on the original sources. How does he learn the knowledge? And he said, I got public records, I reviewed public records, not exactly direct and independent knowledge. I reviewed records I got from the state of Washington pursuant to a Public Records Act request. Again, he's just reviewing publicly disclosed documents at this point. And then he says, I talked to two people, at the state of Washington and at Planned Parenthood. When you look at Devlin, and Devlin requires firsthand, unmediated labor by anything else, what Mr. Blaydell conceded was all he did to obtain this knowledge in this case falls far short, because it was secondhand. It was through public disclosures, like the Gonzalez case, which he conceded in 2009, two years before he filed this case, he knew about. So those are the only two documents you really need to look at, because both of those establish statements by Mr. Blaydell himself that establish that he can't bear his burden here. And he does bear the burden. He bears the burden of showing there was no prior public disclosure, and he bears the burden of showing that he was an original source. So when we turn to the public disclosure issue, and we ask the question of, was the Gonzalez case and the OIG report enough to publicly disclose? Was it substantially similar? The cases are quite clear on this issue, and Metesky, I think Judge Bybee's correct, Metesky's a very different case. The cases that are on point are Alcan, Fine v. Sandia, and Findley. In Alcan, this court was looking at the issue of local electrical contractors who had inappropriately billed on federal contracts. And in Alcan, this court held that even though the prior public disclosure hadn't named the specific local contractor that was at issue in Alcan, it had done enough, and the reason why it had done enough was because it set forth a narrow class of suspected wrongdoers. And that narrow class of suspected wrongdoers was defined by this court as all local subcontractors who were electrical and billed in four years. You can imagine that's far more than the 103 in this case. Yes, Your Honor. Did the OIG report, was the OIG report that specific? It actually was in several different ways. It talks about covered entities. And I think that's why the district court got it right, because she married both the Gonzalez report and the OIG report. I think the OIG report was enough to publicly disclose here, but there's no question that the Gonzalez case plus the OIG report did, and here's why. The first thing it did was it identified specifically the kinds of covered entities and mentioned family planning clinics. Now, what does everybody think of when you hear the word family planning clinic? Everybody thinks of Planned Parenthood. Is it contested? Forgive me for interrupting, but is it contested that the Gonzalez case was the impetus for the request for the OIG report? There's no real contest here. I've never heard a disagreement. In fact, I think we heard a concession here in oral argument that it was. What happened was Senator Grassley wrote a request, and the OIG report itself says only that a Ketam case alleged 340B fraud, and the Gonzalez case did that. And there's no suggestion that it was another. There's another document in the court record that I'd point the court to. It was a, and I apologize for not having the excerpt of record in mind, but the Drug Discount Monitor is a publication that goes out around these issues, and it specifically connected the Gonzalez case to the OIG report. And so it's never been disputed, and it's really quite clear, and I think we just heard a concession of that today. And so to get back to your question, Judge Pais, if you look at the OIG report, it talks about family planning clinics, says that there are 25 states that have rules requiring at-cost billing for 340B drugs, and then it gives a list of those states, and one of those states is Washington. And so the OIG report actually gets pretty darn specific. All you've got to do is look at 340B billing in the state of Washington, which has both a statute and a policy. According to the OIG report, it's in the appendix. So the OIG report, I think, does all that needs to be done here, but even if it didn't, you marry that with the Gonzalez piece, and the Gonzalez complaint, it's on all fours with this case. The Gonzalez complaint starts with the issue of— Well, it talks about the transactions. That's right, it does. And what it does is it says Planned Parenthood gets its oral and emergency contraceptives cheap. And I want to be clear about this. There's a lot of suggestion that the Gonzalez complaint only refers to emergency contraceptives. If you look at excerpts of Record 377, it's very clear on this point. The Gonzalez case, this is an attachment to the Gonzalez case. It's an audit letter written by California, which started the whole Gonzalez thing. And it specifically refers to both oral contraceptives and emergency contraceptives as being overbilled in California. So in California, Gonzalez says Planned Parenthood gets its drugs cheap under 340B. It sells them at its usual and customary, and regulations say they shouldn't do that. That's exactly what Mr. Bladow says here. Planned Parenthood gets its drugs cheap under 340B. It bills them at its usual and customary. The words usual and customary appear in both Gonzalez and in this case. And there are regulations that say it can't do it. And so when you have the OIG report telling you that Washington has these policies to bill only at cost, there's just no distance between this case and Gonzalez, or certainly this case and Gonzalez plus the OIG report. So then you get to the second question. If there's a public disclosure, and there was, can he prove? And he's got the burden by a preponderance of the evidence to prove that he was an original source, and he had direct and independent knowledge. So there's two pieces to that, and I'll start with independent because I think it's an important one. The district court didn't spend much time on it. You're independent if you know about the fraud before the public disclosures. So Mr. Bladau had the burden, proven by a preponderance of the evidence, that he knew about the fraud before Gonzalez came out. And what he points to there is an e-mail exchange that he was having with a Planned Parenthood official. There's no place in that e-mail exchange before March 5th, 2008, which was when Gonzalez became public, where he alleges a fraud. He's poking around because he's got Planned Parenthood of the great northwest's tax records, and those tax records have a reference to profit. So he's poking around to try to figure out where does this profit come from. But there's actually an exchange on March 5th, 2008, in that e-mail, and there's still no suggestion that there's a fraud or that it violates any rule. It was the Gonzalez case, which was unsealed in March of 2008, that led Mr. Bladau to conclude that this was a fraud. Is his problem just one of timing? Or would his actions have been sufficient if he had jumped the gun? Or beaten the gun, rather? The timing issue means he falls short of independence. The efforts are the direct piece. Yes, and so I'm just trying to make sure that you're not skipping over that. I want to be clear on whether you think his conduct, his efforts, were sufficient. I absolutely not. And the reason why they weren't, and I think if the court looks at, there's a series of cases on the issue of independent investigation, which is really what we have here. We have a suggestion that Mr. Bladau did his own work. And probably the best case on this is a Fifth Circuit case called Reagan, and it is cited in the briefs. Even when you do a ton of investigation, it's not enough when all it does is retreads what's already in the public, when it doesn't add anything to what's already in the public. And so if we agree that the Gonzales complaint in the OIG report put all the material elements out in the public, Mr. Bladau could have spent every day for 10 years putting that together and compiling that, but it was already in the public sphere. Devlin was another case, and I actually think counsel pronounced it Blevin, but it's actually Devlin, this court's decision some years back. It's on all fours, and here's why. In Devlin, the relators learned from an insider what was going on. Here, Mr. Bladau learned from an insider, Mr. Gonzales, what was going on. And then he proceeded in Devlin, they proceeded to do their own investigation to confirm internally what was going on, and this court held in Devlin that an independent investigation just wasn't enough to make somebody an original source. Does the case law require that he be an insider? Absolutely not. It does not, and so it's possible that if he... So where do you draw the line? I guess that was a rhetorical question, because we know the answer to that, but where do you draw the line? Where did he fall short? I certainly draw the line short of where Mr. Bladau was in this case. I draw the line at where Reagan did, which is if all the... You can do as much investigation and compilation as you want, but if all you're doing is rearranging what's already out in the public sphere or pulling together what's already out in the public sphere, which is what he did, then you're not doing enough to become an original source. And again, he has the burden here, so I don't even have to prove anything in terms of an absence of effort. Mr. Bladau actually has to prove this by a preponderance of the evidence, and I think the district court got it right here when the district court concluded that he hadn't borne his burden. So at the end of the day, this court has talked about the notion of a whistleblower sounds the alarm. He doesn't echo it. What's happened here is Mr. Bladau echoed what happened in Gonzales and in the OIG report, and for that reason he's not a true whistleblower. He's the kind of person that the public disclosure bar was absolutely designed to prohibit. I won't address, because I didn't hear a lot of argument about today, the issues of the 2010 amendments. They don't apply. I think Hughes is very... The district court said they don't apply. That's right. The district court said they don't apply. Supreme Court has twice in footnotes, in Graham and in Schindler, has held that they don't apply retroactively, and this conduct clearly happened before the March 2010 amendments came into effect. And so we don't need to look at the post-2010. I'd argue that we'd win even under the post-2010 amendments, but we don't need to go there. So, look, Judge Peshman did a very exhaustive analysis and gave Mr. Bladau every chance to meet his burden here, and Mr. Bladau fell short. The district court recognized it. This court should affirm. Unless there's any other questions, I'll sit down. Okay. Thank you. Do you have some time for rebuttal, counsel? Thank you, Your Honor. Very briefly, the blog post, as I mentioned, was actually at the highest level, talking to lay people about a lay subject and saying that this is the kind of fraud that was engaged in in Washington. But if you look at the disclosures, the plaintiff's disclosure at SER 157 and 166 are actually very extensive. He didn't just say, I got this from the development director. He talked about going to the state officers, HRSA. He talked about going to get the rule from them. He talked about getting the billing records from them. He talked about what Mr. Cutler's statements added to the fraud. And in spite of Mr. Almohoffer's reference to Devlin, Devlin does not help him because in Devlin the fraud was disclosed. The dossier was handed to the plaintiffs. In this case, Mr. Cutler did not admit any kind of fraud. He simply admitted that they were billing at market value, which is the essence of the fraud. So he took that and he added the billing records, he added the billing requirement, and he came up with the fraud, the X times Y equals Z. Finally, this is not a narrow class as in the Alaska Union case or the Sandia Labs case. In those cases there were a handful of defendants that operated together under the same contract. In this case you have, as I mentioned, 50 different regimes of Medicaid and you have 103 different Planned Parenthoods, and the rule of this court should not inoculate every Planned Parenthood in America against allegations of billing fraud because of what Mr. Bladau said. So if the court has any further questions, then thank you very much.
judges: Paez, Bybee, Christen